UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Apr 12, 2016

| | |
|---|---|
| In Re: ) | |
| ) | |
| SANDUSKY, Norman Jesse Jr., ) | Case No. 14-12687-R |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| PATRICK J. MALLOY III, TRUSTEE, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Adv. No. 15-01027-R |
| ) | |
| CAROL SANDUSKY, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Plaintiff Patrick J. Malloy III, Trustee ("Trustee") brought this adversary proceeding against Defendant Carol Sandusky ("Carol") in an effort to avoid certain transfers made by Debtor Norman Jesse Sandusky, Jr. ("Norman") to Carol, his spouse. Trustee contends that such transfers were fraudulent to Norman's creditors. The matter was tried to the Court on February 4, 2016. Upon consideration of the evidence admitted at trial, the record in this proceeding, arguments of counsel, including the trial briefs and post-trial briefs, and the applicable law, the Court finds and concludes as follows:

**I.      Jurisdiction**

The Court has jurisdiction of this "core" proceeding by virtue of 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(A), (B), and (H) and Local Civil Rule 84.1(a) of the United States District Court for the Northern District of Oklahoma.

**II.    Procedural History**

On December 24, 2014, Norman filed a petition seeking relief under Chapter 7 of the Bankruptcy Code, and Trustee was appointed trustee of Norman's Chapter 7 estate. Carol is Norman's non-filing spouse.[1]

On April 6, 2015, Trustee filed a six count complaint against Carol, amended on May 12, 2015 (the "Complaint"),[2] seeking the following relief:

1. A declaration that Norman's bankruptcy estate had a joint interest with Carol in certain investment property and in a 2005 Ford Majestic motor home.

2. A declaration that a note executed by Norman in favor of Carol in 2009 (the "2009 Note") was illusory and unenforceable.

3. A judgment avoiding the 2009 Note pursuant to 11 U.S.C. § 544(b)[3] and the Oklahoma Uniform Fraudulent Transfer Act ("UFTA").

4. A judgment avoiding Norman's transfer to Carol, in 2012, of Norman's one-half interest in the proceeds of the sale of jointly-owned commercial property ("Proceeds"), again under 11 U.S.C. § 544(b) and UFTA, and a money judgment against Carol and in favor of the estate the amount of $81,143.63.

5. The imposition of a constructive trust or lien in favor of the estate against Norman's one-half interest in the Proceeds in Carol's possession and control.

6. A preliminary injunction restraining Carol from transferring, encumbering, or disposing of Norman's one-half interest in the Proceeds.

---

[1] In her professional consulting practice, Carol is known as Carol Bonacci.

[2] Adv. Doc. 6.

[3] Under 11 U.S.C. § 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." Under this section, Trustee "steps into the shoes" of an unsecured creditor who has standing to avoid a transfer or obligation under state fraudulent transfer law.

Several of these claims were adjudicated prior to trial. With respect to Trustee's first claim for relief, summary judgment was granted in favor of Carol as to the ownership of the investment property,[4] and Trustee acquiesced at trial to a finding that the estate did not have an interest in the 2005 Ford Majestic motor home.[5] Trustee's request for a declaration that the 2009 Note was illusory and unenforceable, his second claim for relief, was also denied in the order granting Carol partial summary judgment.[6] Trustee's application for a preliminary injunction, his sixth claim for relief, was denied after an evidentiary hearing held in June 2015.[7]

The trial encompassed Trustee's remaining claims, namely, his requests for avoidance of the 2009 Note ("Note Claim"), for avoidance of the transfer to Carol of Norman's one-half interest in the Proceeds ("Proceeds Claim"), and for a constructive trust remedy in the event either transfer is avoided. Trustee bases his Note Claim on 24 O.S. § 116(A)(1) and/or § 116(A)(2). Trustee's Proceeds Claim relies on 24 O.S. § 116(A)(1) and/or § 117(A).

As an initial matter, Carol asserts, and the Court agrees, that Trustee's Note Claim under § 116(A)(2) is barred by a four-year limitation period. Section 116(A)(2) provides for the avoidance of an obligation if the debtor made the obligation–

> without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

---

[4] Order Granting Defendant's Motion for Partial Summary Judgment (Adv. Doc. 60).

[5] Transcript of Trial on the Merits held on February 4, 2016 ("Tr.") at 159.

[6] Order Granting Defendant's Motion for Partial Summary Judgment (Adv. Doc. 60).

[7] Order Denying Trustee's Application for Preliminary Injunction (Adv. Doc. 23).

> a. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or
>
> b. intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.[8]

The UFTA limitation of actions section provides–

> A cause of action with respect to a fraudulent transfer or obligation . . . is extinguished unless action is brought:
>
> \*\*\*\*\*
>
> Pursuant to the provisions of paragraph 2 of subsection A of Section 116 of this title or subsection A of Section 117 of this title, within four (4) years after the transfer was made or the obligation was incurred[.][9]

It is undisputed that the 2009 Note was executed on May 22, 2009. Any claim for avoidance of the 2009 Note under § 116(A)(2) was extinguished on May 22, 2013 – more than eighteen months prior to Norman's bankruptcy filing.[10]

---

[8] 24 O.S. § 116(A)(2).

[9] Id. § 121(2).

[10] In his supplemental post-trial brief (Doc. 84), Trustee argues that the limitations period on the Note Claim did not begin to run until 2012, when the condition precedent to Norman's obligation to pay the 2009 Note occurred. The limitations period begins on the date "the obligation was *incurred,*" not the date performance was due. 24 O.S. § 121(2) (emphasis added). For the purposes of UFTA, "[a]n obligation is incurred . . . if evidenced by a writing, when the writing executed by the obligor is delivered to or for the benefit of the obligee." Id. § 118(5). Norman incurred the obligation when he executed and delivered the note to Carol in 2009.
    Further, to the extent Trustee seeks to avoid the 2009 Note as constructively fraudulent under § 117(A) (a claim not preserved in the Pretrial Order but raised in Trustee's supplemental post-trial brief at page 2), such claim was likewise extinguished under Id. § 121(2).

4

Carol also asserts a statute of limitations defense against the Note Claim alleged under § 116(A)(1).[11] Section 116(A)(1) provides that an obligation is fraudulent as to an existing or future creditor if the debtor incurred the obligation "with actual intent to hinder, delay, or defraud any creditor of the debtor."[12] A cause of action under § 116(A)(1) is extinguished if an action is not brought within four years after the transfer or obligation, or "if later, within one (1) year after the transfer or obligation was or could reasonably have been discovered by the claimant."[13]

The 2009 Note was not recorded or otherwise published, and Carol did not present any evidence tending to show that any of Norman's unsecured creditors, acting reasonably, should have investigated and discovered the transaction between Norman and Carol more than one year prior to the date Trustee filed his Complaint.[14] Norman filed his bankruptcy petition on December 24, 2014, and Trustee learned of the transaction at some point thereafter. Trustee filed this adversary proceeding on April 6, 2015, well within one year after the earliest possible discovery date. Accordingly, the Note Claim under § 116(A)(1) survives.

The Proceeds Claim is unaffected by the limitations statute. Trustee attacks Norman's transfer of the Proceeds to Carol under § 116(A)(1) as having been made with "actual intent

---

[11] Pretrial Order (Doc. 68) at 5.

[12] 24 O.S. § 116(A)(1).

[13] Id. § 121(1).

[14] As proponent of the affirmative defense, Carol had the burden of proving that the statute of limitations applies. Moneypenny v. Dawson, 2006 OK 53, 141 P.3d 549, 551.

5

to hinder, delay, or defraud" a creditor.[15] In the alternative, Trustee invokes § 117(A), contending that the Norman did not receive "reasonably equivalent value" in exchange for the Proceeds and that Norman was "insolvent at the time or . . . became insolvent as a result of the transfer."[16]

With the scope of issues so narrowed, the Court makes the following findings based upon the documentary evidence admitted and upon the testimony of Carol and Norman, both of whom were forthright and credible witnesses.

### III.  Findings of fact

In 1989, Norman established a business called LaserWorks, Inc. ("LaserWorks"), which provided maintenance, repairs, and supplies to owners and lessors of laser printers. Norman was the sole shareholder of LaserWorks.[17] In its early years, LaserWorks employed several service technicians and generated significant revenue by maintaining and repairing the large and expensive laser printers of the era.

Carol is an independent computer consultant who manages security and controls for large corporations that employ a complex multi-faceted "back-end office software" package to track business operations and processes. Carol operates as a sole proprietor and through her solely-owned corporation. Carol's business is unrelated to LaserWorks. Norman does not have any equity interest in Carol's business. Throughout their marriage, Norman and Carol managed their business and personal finances separately from one another.

---

[15] Id. § 116(A)(1).

[16] Id. § 117(A).

[17] Trustee's Exhibit 12.

In December 2000, Norman and Carol jointly purchased a commercial building located at 11507 E. 58th Street, Tulsa, Oklahoma (the "Commercial Property"). Norman and Carol intended to share equally in the profits and equity from the Commercial Property. LaserWorks occupied the building as its place of business and paid rent to Norman and Carol when LaserWorks could afford to do so.

By 2009, in the midst of a nationwide economic recession, LaserWorks was operating on credit and had amassed unsecured debt in excess of $100,000.00. LaserWorks was in default on payments to vendors and had not been paying rent to Carol and Norman. Norman was jointly liable on all LaserWorks' unsecured debt. Carol was not.

In April 2009, the appraised value of the Commercial Property was $485,000.00,[18] and the debt secured by a mortgage on the Commercial Property was $125,213.42. Norman desired to refinance the Commercial Property to cash out some of the considerable available equity, pay off some of LaserWorks' debt, and provide working capital to fund his effort to "keep LaserWorks afloat and get it stood back up."[19] Carol had no obligation to consent to the refinancing and had serious reservations about the viability of LaserWorks. But she ultimately agreed to allow Norman to withdraw a substantial portion of the accumulated equity to pay obligations upon which he was solely liable and to try to rescue LaserWorks, with the understanding that she would realize the same amount of equity from the

---

[18]Trustee's Exhibit 4 (appraisal of Commercial Property commissioned by Energy One Federal Credit Union).

[19]Tr. at 68.

Commercial Property later, when it was sold. With that goal in mind, the refinance transaction proceeded as follows:

- On May 22, 2009, Norman and Carol borrowed $388,000.00 from Energy One Federal Credit Union ("Energy One"), executing a note secured by a mortgage on the Commercial Property.

- From the $388,000.00 in proceeds, Carol and Norman paid –

    - $125,213.42 to BancFirst to pay off the mortgage on the Commercial Property;

    - $77,423.18 to Energy One to retire a second mortgage they had previously taken on their homestead to secure a line of credit;

    - $15,739.76 to BancFirst to retire a debt secured by a commercial van owned by Norman and used by LaserWorks; and

    - $3,836.00 in settlement charges.[20]

- Norman took exclusive control of the remaining proceeds, $165,787.64, with the intention of using them to pay his and LaserWorks' existing debt and to rehabilitate the business.

- Norman executed the 2009 Note in favor of Carol, promising to pay Carol "upon the sale of the building located at 11507 East 58th Street, Tulsa, Oklahoma in the amount of $165,000 upon the closing of said building. The full amount will be due upon mortgage finance closing." The 2009 Note bore no interest or late fees.[21]

Norman used $106,664.71 of the refinance proceeds to pay, or to bring current, pre-existing unsecured vendor and credit card debt that he had incurred on behalf of Laser Works.[22] He loaned the remaining $59,000.00 to LaserWorks for operating capital.

---

[20]Settlement Statement, Trustee's Exhibit 2.

[21]Trustee's Exhibit 5.

[22]On accounts that were brought current, LaserWorks thereafter made sporadic minimum payments, but those debts were never paid in full. For example, as of early May 2009, the balance on a CapitalOne credit card was approximately $13,500.00 and the balance on a Chase line of credit was in excess of $50,000.00. These debts were still outstanding

By paying off the commercial van debt and more than $106,000 of unsecured credit card debt, Norman reduced LaserWorks' monthly debt service, which he hoped would ameliorate LaserWorks' negative cash flow. Norman also eliminated an expensive remote monitoring program and laid off eighty percent of LaserWorks' workforce. In 2010, Norman sold a duplex[23] and invested most of the net proceeds, approximately $45,000.00, in LaserWorks. Carol also loaned additional funds to LaserWorks.[24] Norman also sold two commercial vans that he owned but were used by LaserWorks.

Unfortunately, despite the debt restructure, downsizing, and investment of personal funds, LaserWorks continued to operate at a loss. Norman testified that the depressed economic climate and the introduction of "throw-away printers" devastated LaserWorks' profitable lines of business.[25] Instead of paying Laserworks for routine maintenance, or for repairs, customers simply disposed of malfunctioning machines and bought inexpensive replacements. LaserWorks ceased doing business in the spring of 2012, and dissolved in the summer of 2012.

---

when Norman (who was jointly liable with LaserWorks) filed his Chapter 7 petition in December 2014.

[23]Norman was sole owner of the duplex.

[24]Trustee's Exhibit 17 (On-Demand Unsecured Promissory Note dated October 21, 2010, in which Norman promises to repay Carol funds periodically loaned to LaserWorks, which were tracked by LaserWorks' accounting system). Carol forgave those loans after LaserWorks ceased doing business in the summer of 2012.

[25]Tr. at 114.

On July 30, 2012, Norman and Carol sold the Commercial Property.[26]  A check representing the net sale proceeds in the amount of $162,287.27 was made payable to Norman and Carol.  Norman endorsed the check, and on August 3, 2012, Carol deposited the check in an account styled "Carol A Bonacci or Norman J Sandusky."  On the same day the deposit was made, Carol transferred $162,287.27 from the joint account to a newly established account in her name only.[27]  By virtue of this transfer, Carol and Norman considered the 2009 Note paid in full.

**IV.   Conclusions of Law**

A.   <u>The Note Claim</u>

Section 116 of title 24 of the Oklahoma Statutes provides–

A.  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> 1. with actual intent to hinder, delay, or defraud any creditor of the debtor[.]

*****

B.  In determining actual intent pursuant to the provisions of paragraph 1 of subsection A of this section, consideration may be given, among other factors, to whether:

> 1. the transfer or obligation was to an insider;
>
> 2. the debtor retained possession or control of the property transferred after the transfer;
>
> 3. the transfer or obligation was disclosed or concealed;

---

[26] Settlement Statement, Trustee's Exhibit 18.

[27] Energy One Bank Statements, Trustee's Exhibit 19.

10

    4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

    5. the transfer was of substantially all the debtor's assets;

    6. the debtor absconded;

    7. the debtor removed or concealed assets;

    8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

    9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

    10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and

    11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[28]

When one or more of these badges are present, the Court may infer fraudulent intent.[29] From its analysis of these badges, the Court finds the factors tending toward fraudulent intent few and unconvincing. Yes, the 2009 Note was executed in favor of Norman's spouse, an insider, and transfers to family members are subject to close scrutiny.[30] Carol was also, however, joint owner of the Commercial Property from which Norman drew funds to pay his individual and business debt. In essence, she loaned him her half of the equity he had taken out in exchange for his promise to pay it back when the property was sold, a dollar-for-dollar exchange.

---

[28] 24 O.S. § 116(A)(1) and (B).

[29] Taylor v. Rupp (In re Taylor), 133 F.3d 1336, 1338-39 (10th Cir. 1998).

[30] Zubrod v. Kelsey (In re Kelsey), 270 B.R. 776, 782 (B.A.P. 10th Cir. 2001).

In considering the other factors listed in Section 116(B), the Court finds and concludes as follows:

- Trustee did not establish that Norman had an obligation to disclose the note to any third party and presented no credible evidence that Norman actively concealed the existence of the 2009 Note. Trustee argues that because the 2009 Note was not recorded, Norman's future creditors could not know that his equity interest in the Commercial Property was worthless. However, there was no evidence that any unsecured creditor knew of or relied upon Norman's joint ownership in the Commercial Property in advancing goods, services, or funds to LaserWorks or to Norman.

- Because Carol received only $162,287.27 upon the sale of the Commercial Property instead of $165,000, Trustee points to the fact that Norman did not schedule Carol as a creditor as evidence of an attempt to conceal the 2009 Note. The 2009 Note did not contemplate that Norman would be liable to Carol for any deficiency in the event that the Proceeds were less than the debt, however. Both parties considered the 2009 Note satisfied upon transfer of the Proceeds to Carol. Carol forgave the other unsecured loans she made to LaserWorks when the business closed in 2012. The Court does not believe Norman's failure to mention the 2009 Note in his schedules constitutes evidence of concealment.

- Although Norman admits that he and LaserWorks were behind on payments to creditors, Trustee produced no evidence that Norman had been sued or threatened with lawsuits in 2009.

- Execution of the 2009 Note did not result in the transfer of essentially all of Norman's non-exempt assets or render him "judgment-proof." At that time, he still owned a non-exempt duplex and three commercial vehicles with total realizable value of at least $70,000.

- Norman did not abscond with the refinance proceeds, but rather plowed them, and more, into LaserWorks in an effort to turn the business around. The net result of the refinancing transaction was beneficial to Norman's existing creditors. Many were fully paid in 2009 and did not have to wait until the sale of the Commercial Property in 2012 to realize the benefit of Norman's interest in the property.

- There is no evidence that Norman used the proceeds to purchase luxury goods, take vacations, or engage in excessive living or gifting.

- There is no credible evidence that Norman concealed any assets from any creditor at the time of the transaction.

- The value Norman received, *i.e.,* exclusive control and use of $165,878.64 of the equity in the Commercial Property, was reasonably equivalent to the value represented by the 2009 Note, which promised Carol exclusive control and use of $165,000.00 of equity in the same property on a deferred basis.[31]

- Because Carol was not liable on Norman's or LaserWorks' debts, Carol's half-interest in the Commercial Property was *never* available to Norman's creditors, so preserving her interest in the equity by virtue of the 2009 Note did not diminish Norman's estate.[32]

- Norman was not paying his and LaserWorks' debts as they came due in May 2009, and was therefore presumed insolvent under UFTA.[33] However, Norman's clear intent, in obtaining an advance on his equity, was to "bring current" those past due debts and make LaserWorks profitable.

- There is no evidence that Norman incurred any unusual or non-routine debt before or after the 2009 Note transaction. Pre-existing debt was ordinary trade debt and post-transaction debt was ordinary trade debt. There is no evidence that Norman was trying to avoid paying creditors; on the contrary, his single-minded goal was to get his finances in order by paying off debt and rehabilitating his business in order to generate revenue, further reduce his debt burden, and provide an income for himself.

---

[31]For many reasons, the exchange actually favored Norman (and his creditors). The value of Carol's interest in the refinance proceeds, which she ceded to Norman, was $82,939. 32. Under the 2009 Note, Carol was entitled to the first $165,000 from the proceeds of the sale of the property, so Norman was obligated to pay Carol only $82,500 from his interest in the eventual sale proceeds.

[32]Had Carol been an unrelated business partner instead of Norman's spouse, Norman's withdrawal of more than his half of the equity from the Commercial Property to pay his personal debts would have required his partner's consent, and the partner would have legitimately demanded some form of promise to repay the amount constituting the partner's interest in the funds withdrawn. Carol's interest in the Commercial Property was no different than that of the hypothetical business partner. The fact that Carol was married to Norman did not subject her interest in the property to claims by Norman's creditors.

"A joint interest is one owned by several persons in either real or personal property *in equal shares*, being a joint title created by a single instrument . . when expressly declared in the instrument."  60 O.S. § 74 (emphasis added).  "[O]ne joint tenant cannot encumber the interest of another joint tenant." American Nat'l Bank and Trust Co. v. McGinnis, 1977 OK 47, 571 P.2d 1198, 1200.

[33]24 O.S. § 114(B).

13

The Court finds and concludes that Norman did not intend to hinder, delay, or defraud any creditor when he undertook to rehabilitate his business by refinancing the jointly-owned Commercial Property, taking an advance of his interest in the equity while promising Carol that she would receive her half-interest when the property sold, and using the proceeds to reduce monthly debt service, pay down unsecured debt, eliminate defaults, and inject working capital into LaserWorks. The totality of circumstances weighs in favor of finding that Norman possessed a good faith belief that he was acting in the best interests of his unsecured creditors by reducing and restructuring his unsecured debt with the hope that LaserWorks would generate future revenues to satisfy all unsecured creditors.

As Trustee did not meet his burden of proving that Norman actually intended to hinder, delay, or defraud existing or future creditors in executing the 2009 Note, the 2009 Note is not avoidable.[34]

B.   The Proceeds Claim

Section 117(A) provides–

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer

---

[34] Carol asserted 24 O.S. § 120(A) as a defense to the voidability of the 2009 Note. Under Section 120(A), "[a] transfer or obligation is not voidable as provided for in [§ 116(A)(1)] against a person who took in good faith and for a reasonably equivalent value[.]" Because Trustee did not establish that the 2009 Note is voidable, it is unnecessary to make findings on contested factual issues related to whether Carol took the note in good faith (*i.e.*, whether Carol had general or intimate knowledge of LaserWorks' financial condition; whether she was an officer or employee of LaserWorks; whether she believed LaserWorks could be rehabilitated, etc.).

14

> . . . and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer[.] [35]

Trustee claims he is entitled to recover Norman's half-interest in the Proceeds generated by the 2012 sale of the Commercial Property ($81,143.63) from Carol under Section 117(A). Although it is undisputed that Norman was hopelessly insolvent in 2012, Trustee's claim under this section fails because Norman received reasonably equivalent value in exchange for the transfer of the Proceeds to Carol, *i.e.*, satisfaction of the 2009 Note. Under UFTA, "[v]alue is given for a transfer . . . if in exchange for the transfer, . . . an antecedent debt is . . . satisfied."[36] As determined above, the 2009 Note is not avoidable, and as determined on summary judgment, the 2009 Note was not illusory and was enforceable.[37] Norman had already drawn out all the value to which he–and his creditors–were entitled from the Commercial Property, and he had a *bona fide* obligation to transfer to Carol his half-interest in up to $165,000.00 of the net proceeds of the sale.[38] To avoid the transfer, and allow

---

[35] 24 O.S. § 117(A).

[36] Id. § 115(A).

[37] See Order Granting Defendant's Motion for Partial Summary Judgment (Doc. 60).

[38] In his supplemental post-trial brief, Trustee argues that "the Tenth Circuit B.A.P. has rejected a per se rule application to cases involving payment of an antecedent debt," citing Stillwater Nat'l Bank and Trust Co. v. Kirtley (In re Solomon), 299 B.R. 626 (B.A.P. 10th Cir. 2003). In Solomon, the debtors, who guaranteed loans of a third party (their wholly-owned corporation), granted a security interest in their individual property to secure an antecedent debt of the corporation. The security interest was avoidable, even though it was made to secure an antecedent debt, because the debtors themselves did not acquire reasonably equivalent value in exchange for the security interest. Debtors received none of the proceeds of the original loan–that is, their estate was not enhanced by an amount equal to the encumbrance–and their obligation on the guarantee was not reduced by the value of collateral given to secure the corporation's debt. Id. at 637-38. Debtors' unsecured creditors suffered the loss of the value of the collateral with no corresponding benefit.

15

Trustee to recover $81,143.63, would result in Norman's creditors unjustly reaping the benefit of three-fourths of the value of the Commercial Property, a total of $246,931.27, while leaving Carol – and her creditors – only $81,143.63 from her undisputed one-half interest in the property.

As for Trustee's claim under Section 116(A)(1) (that the transfer was made with actual intent to hinder, delay or defraud creditors), the Court concludes that because Norman received dollar-for-dollar debt reduction for the transfer, Norman's net estate was not diminished and creditors were not harmed. Thus, the transfer cannot be avoided as fraudulent, regardless of Norman's intent.[39]

---

In this case, Norman directly received reasonably equivalent value at the time he incurred the debt to Carol in 2009 (*i.e.,* $165,787.64 that was used to benefit his wholly-owned business and his unsecured creditors). His payment of the valid and enforceable antecedent debt to Carol directly reduced his total liabilities in 2012. Solomon is thus distinguishable on its facts and has no bearing on the outcome of this case. See also In re AppliedTheory Corp., 323 B.R. 838 (Bankr. S.D.N.Y. 2005), *aff'd* 330 B.R. 362 (S.D.N.Y. 2005) (likewise distinguishing Solomon, and finding reasonably equivalent value was exchanged in a case where the debtor pledged property to secure an antecedent debt that had directly benefitted the debtor).

[39]Undoubtedly, satisfying his debt to Carol reduced the extent of Norman's assets available to pay other unsecured creditors. Preferring to pay one unsecured creditor may be unfair to other unsecured creditors, but it is not, without more, fraudulent. Under Oklahoma law, "[a]ny person in this state indebted to other persons shall have the right to prefer one or more of such creditors in good faith to secure a valid debt, which preference may be manifested by payment, by mortgages, . . . or by the transfer of personal property or real estate[.]" 24 O.S. § 11. Notably, the statute does not except from its scope preferential transfers to a spouse. Oklahoma courts have held that although such transfers deserve close scrutiny, if the debt owing to the spouse is found valid, the transferor "has the right to prefer" the spouse. See Riedell v. Lydick, 1936 OK 216, 55 P.2d 465; Lynn v. Brenner, 1930 OK 352, 291 P. 509, 511 ("It is well settled that a husband may, for a valuable consideration, even though insolvent, convey property to his wife where there is an adequate consideration paid from the wife's separate estate or where the consideration is a debt owing by the husband to the wife, and the value of the property is not materially in excess of the debt.").

      C.      <u>Constructive Trust Claim</u>

In the absence of an avoidable transfer, Trustee is not entitled to the remedy of a constructive trust over the Proceeds in Carol's possession.

**V.      Conclusion**

For the reasons stated, judgment will be entered against Trustee and in favor of Carol on all claims asserted against her.

**SO ORDERED** this 12th day of April, 2016.

*/s/ Dana L. Rasure*
DANA L. RASURE
UNITED STATES BANKRUPTCY JUDGE